788 So.2d 223 (2001)
Jeffrey Lee ATWATER, Appellant,
v.
STATE of Florida, Appellee.
Jeffrey Lee Atwater, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents.
Nos. SC94865, SC99-179.
Supreme Court of Florida.
June 7, 2001.
*226 Mark S. Gruber, Assistant CCRC, Capital Collateral Regional CounselMiddle, Tampa, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Jeffrey Lee Atwater, a prisoner under sentence of death, appeals an order entered by the trial court denying his post-conviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850; he also petitions this Court for a writ of habeas corpus. We have jurisdiction. Art. V, § 3(b)(1), (9) Fla. Const. These cases have been consolidated. We affirm the trial court's denial of 3.850 relief, and we deny habeas relief.

STATEMENT OF THE CASE AND FACTS
The following is a statement of the facts that appears in Atwater v. State, 626 So.2d 1325, 1327 (Fla.1993):
On August 11, 1989, Atwater entered the John Knox Apartments in St. Petersburg, Florida, to see Ken Smith, the victim in this case. Upon entering the apartment building, Atwater proceeded to Smith's room where he remained for about twenty minutes. After Atwater left, Smith's body was discovered in the room. Smith was dead and his money was missing. Atwater told several people that he had killed Smith. Atwater was arrested the same day for killing Smith. At trial, he was convicted of first-degree murder and robbery. The jury recommended death by a vote of eleven to one. The trial judge found three aggravating factors and no statutory mitigating factors. The judge held that the aggravators outweighed the mitigators and sentenced Atwater to death.
On appeal, this Court affirmed the convictions and sentence of death. Atwater timely filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. He raised twenty-four claims. After a Huff[1] hearing, the trial *227 court summarily denied all but two[2] of Atwater's claims. After an evidentiary hearing on the two remaining claims, however, the trial court denied those two claims as well.[3]
Atwater now appeals the denial of all the claims in his initial 3.850 motion and petitions separately for a writ of habeas corpus.
In the petition for writ of habeas corpus, Atwater alleges: (1) The trial court gave a nonstandard Enmund/Tison[4] jury instruction in the penalty phase and appellate counsel was ineffective in failing to raise this issue; (2) Atwater's sentence rests upon an unconstitutionally automatic aggravating circumstance; (3) Atwater's rights were denied by the judge and jury's consideration of nonstatutory aggravating circumstances. Appellate counsel rendered ineffective assistance by failing to raise this claim; (4) Electrocution is cruel and unusual punishment; (5) No reliable transcript of Atwater's trial exists, and reliable appellate review was and is not possible, and there is no way to ensure that which occurred in the trial court was or can be reviewed on appeal, so the judgment and sentence must be vacated.
The petition for writ of habeas corpus is hereby denied. Claims 1 and 2 are not proper claims for habeas corpus relief. "[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.850 motion, or on matters that were not objected to at trial." Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989). As to the substance of claim 2, this Court rejected this argument in Hudson v. State, 708 So.2d 256 (Fla.1998), and Blanco v. State, 706 So.2d 7 (Fla.1997). Claims 3, 4, and 5 were also raised in Atwater's motion for postconviction relief and are procedurally barred as well. See Parker, 550 So.2d 459. As for the claims of ineffective assistance of appellate counsel raised in claims 1 and 3, these claims are without merit. See Harvey v. Dugger, 650 So.2d 982 (Fla. 1995); Ferguson v. Singletary, 632 So.2d 53 (Fla.1993); Scott v. Dugger, 604 So.2d 465, 469 (Fla.1992) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
Atwater's claims on appeal from the denial of his 3.850 motion are paraphrased as follows: (1) Atwater's trial counsel was ineffective because counsel conceded guilt without Atwater's consent; (2) The trial court erred in denying Atwater a hearing on his claim that he was denied effective assistance of counsel in the penalty phase of the trial; (3) Judgment *228 must be vacated because no reliable transcript of Atwater's trial exists and reliable appellate review is and was not possible; (4) Trial counsel was ineffective because the state elicited false and misleading evidence and expert testimony from FBI agents; (5) The trial court erred in allowing the prosecutor to elicit opinion testimony regarding blood spatter evidence from unqualified witnesses; (6) The CCP aggravator is unconstitutionally vague and the jury was improperly instructed on this aggravator; (7) The State failed to reveal that it made promises of lenient treatment to witnesses; (8) The trial court erred in improperly failing to find the statutory mitigator of no significant criminal history; (9) The trial court failed to ensure Atwater's presence during critical stages of the proceedings and Atwater was prejudiced thereby; (10) The State failed to prove each and every element of the offenses charged; (11) Atwater's guilt phase jury instructions were erroneous, unreliable and unsupported by the evidence; (12) The jury and judge improperly considered nonstatutory aggravating circumstances: the prosecutor's inflammatory and improper comments and arguments; (13) Trial counsel was ineffective during voir dire; (14) Atwater's sentence rests upon unconstitutionally automatic aggravating circumstances; (15) The trial court violated the Eighth Amendment by failing to find and weigh the mitigating circumstances in the record; (16) Florida's capital sentencing statute is unconstitutional on its face and as applied because it fails to prevent the arbitrary and capricious imposition of the death penalty; (17) Atwater was denied effective assistance of counsel at the pre-trial phase of his trial; (18) The errors at trial were not harmless when viewed as a whole; (19) Atwater was denied the right to an individualized sentencing when the court submitted to the jury during deliberations a copy of a death penalty sentencing outline designed as a judicial tool to assist the courts in conducting a penalty phase trial; (20) Atwater was denied effective assistance of counsel at pre-trial and the guilt phase when the defense attorney failed to object to the introduction of gruesome and shocking autopsy photos; (21) Atwater is innocent of first degree and second-degree murder and was denied adversarial testing due to ineffective assistance of counsel; (22) Atwater was denied effective assistance of counsel at pretrial and guilt phase of his trial because a full adversarial testing did not occur and counsel's performance was deficient.
We only discuss claims 1 and 2 of the 3.850 motion.[5]
*229 We begin our analysis with the general proposition that a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. See, e.g., Maharaj v. State, 684 So.2d 726 (Fla.1996); Anderson v. State, 627 So.2d 1170 (Fla. 1993); Hoffman v. State, 571 So.2d 449 (Fla.1990); Holland v. State, 503 So.2d 1250 (Fla.1987); Lemon v. State, 498 So.2d 923 (Fla.1986); Fla. R.Crim. P. 3.850. The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden. See Kennedy v. State, 547 So.2d 912 (Fla.1989). However, in cases where there has been no evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. See Peede v. State, 748 So.2d 253 (Fla.1999); Valle v. State, 705 So.2d 1331 (Fla.1997). We must examine each claim to determine if it is legally sufficient, and, if so, determine whether or not the claim is refuted by the record.
Generally, when a defendant alleges ineffective assistance of counsel, he must establish the two prongs necessary to demonstrate ineffectiveness as outlined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), specifically:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. 2052. In reviewing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.
In claim 1 of his motion for post-conviction relief, Atwater argues that during closing arguments, his counsel forcefully argued in favor of second-degree murder, displayed gruesome crime scene photographs to the jury, argued the crime was one of malice, and rejected any consideration of manslaughter because the facts supported a more serious offense. Defense counsel's actions, Atwater argues, were more like those of a prosecutor than a defense attorney. Atwater states that he did not consent to defense counsel's strategy to concede guilt to any crime. He argues that conceding guilt is equivalent to a guilty plea, and defense counsel was required under Nixon v. Singletary, 758 So.2d 618 (Fla.2000), to secure Atwater's explicit consent before making any concession to any element of the crime charged, even if the concession was to a lesser included offense.
The State argues that any concession to a lesser included offense was legitimate trial strategy in an attempt to save Atwater's life and that such a strategy was necessary in light of the overwhelming evidence of guilt. The State further contends counsel's action was proper even without *230 Atwater's knowledge or consent, in accord with McNeal v. Wainwright, 722 F.2d 674 (11th Cir.1984), and McNeal v. State, 409 So.2d 528 (Fla. 5th DCA 1982).
At the evidentiary hearing below, defense co-counsel White testified that as an experienced attorney of seventeen years with five or six capital trials and over a hundred criminal trials, he did not believe Atwater had a chance at getting an acquittal. His strategy was to save Atwater's life. Defense co-counsel Schwartzberg testified that although he did not recollect a specific conversation with Atwater as to whether Atwater would consent to such a strategy, he always explains his strategy to his clients and would have done so in this case.
Not all decisions of counsel are reviewable under Strickland as constituting ineffective assistance of counsel. "[A]ny specific discretionary or judgmental act or position of trial counsel, whether tactical or strategic, on an inquiry as to effectiveness of counsel" will not be considered under Strickland. McNeal v. State, 409 So.2d 528, 529 (Fla. 5th DCA 1982). Sometimes concession of guilt to some of the prosecutor's claims is good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury.
When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position.
Id. at 529. In McNeal, the defendant was on trial for a capital felony. Defense counsel argued in summation to the jury that, "at most and at best, one and only logical result of the State's evidence was proof of manslaughter." Id. The defendant was nevertheless convicted of first-degree murder. On appeal from the denial of his motion for postconviction relief, defendant argued that defense counsel abdicated his function and the defendant's cause. The defendant claimed he did not consent to the concession. The court rejected the defendant's argument, however, and held that "[t]o be effectual, trial counsel should be able to do this without express approval of his client and without risk of being branded as being professionally ineffective because others may have different judgments or less experience." Id.
In seeking federal habeas corpus relief, McNeal again alleged that his trial counsel improperly conceded guilt without his consent. The Eleventh Circuit agreed that defense counsel's decision to concede guilt to a lesser charge was a tactical decision and not reviewable as an ineffective assistance of counsel claim. "In view of the overwhelming evidence against McNeal, including a tape recording of his confession to the shooting, the strategy of trial counsel was proper and would not amount to a constitutional violation." McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir.1984). The Eleventh Circuit distinguished McNeal from a situation where defense counsel concedes guilt to the offense charged and makes a plea for leniency. The latter situation requires a client's consent. The former is counsel's strategy that may bind a client even when made without consultation. See McNeal, 722 F.2d at 677 (citing Thomas v. Zant, 697 F.2d 977, 987 (11th Cir.1983)).
The trial court in this case properly relied upon and applied McNeal. Defense *231 counsel properly made a strategic decision to argue that the facts showed Atwater's acts constituted second-degree murder, and not first-degree murder as was charged. This argument was presented to the jury after the State presented its case and after the State's summation of the evidence in closing argument. As we stated in our opinion on the direct appeal of this case, there was overwhelming evidence of guilt. Atwater v. State, 626 So.2d 1325 (Fla.1993).
In light of the evidence against Atwater, defense counsel properly attempted to maintain credibility with the jury by being candid as to the weight of the evidence. Faced with the prospect of a guilty verdict for first-degree murder and in light of the State's evidence, defense counsel's concession, which was made only in rebuttal to the State's closing argument, was reasonable and does not amount to a constitutional violation. The concession was made to a lesser crime than charged, during rebuttal closing argument, and after a meaningful adversarial testing of the State's case. See, e.g., Brown v. State, 755 So.2d 616 (Fla.2000) (holding that concession of guilt of lesser offense did not require defendant's consent and was proper strategy in attempt to avoid death sentence in light of overwhelming evidence).
While counsel's actions in this case were proper, not every situation permits trial counsel to make a concession on a defendant's behalf without the defendant's consent. In Nixon v. Singletary, 758 So.2d 618 (Fla.2000), we remanded a case where counsel conceded the defendant's guilt to the crime charged in the opening statement of the guilt phase. In opening statement, before any evidence was presented, defense counsel told the jury that the case was not about the victim's death, but about the defendant's death and whether the defendant would die by electrocution or die by natural causes after a lifetime of confinement. In closing argument, defense counsel told the jury that he believed the State had proven its case of first-degree premeditated murder against his client. Defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing; therefore, the State's case was never challenged.
"[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Thus, in Nixon we held that unless the defendant expressly consented to this strategy, or in effect knowingly and voluntarily consented to decline meaningful adversarial testing of the prosecution's case, then prejudice to the defendant is presumed and counsel is thus per se ineffective.[6] The presumption discussed in Cronic, while applicable in Nixon, is not applicable here.
In this case, there was a meaningful adversarial testing. The State presented twenty witnesses. Defense counsel conducted meaningful cross-examination of fifteen of these witnesses. The witnesses that defense counsel did not cross-examine were minor witnesses. At no point during the opening statement or during any of the testimony did defense counsel concede Atwater's guilt. During the first part of defense counsel's closing argument, defense counsel argued that the State failed *232 to prove robbery and therefore could not prove felony murder. Defense counsel stated in the first part of closing arguments that he would address premeditation after the State's closing argument. The State argued in closing argument that it had proven robbery and premeditation, and discussed the evidence presented which included: Atwater had threatened to kill Smith a week before; Smith was afraid of Atwater and hid from him; on the night of the murder Atwater signed in on the clerk's log at Smith's apartment building; Atwater exited approximately twenty minutes later and told the desk clerk that nobody answered the door; Atwater had blood on his shoes and pants that was not from Atwater himself; and Atwater told his aunt and cousin that he killed Smith and enjoyed it. In response, then, and in rebuttal closing argument, defense counsel addressed premeditation and argued that the evidence might support the lesser offense of second-degree murder, but there was nothing to support premeditation. In light of the overwhelming evidence of guilt presented by the State, which we acknowledged in our opinion on the direct appeal, defense counsel's argument was reasonable. Ineffective assistance of counsel is not measured by the result of counsel's efforts. We cannot say that counsel here did not subject the State's case to meaningful adversarial testing. Indeed, defense counsel did subject the State's case to meaningful testing, and only after the State's case was presented and fully argued did defense counsel resort to making some concessiona trial strategy intended to save Atwater's life. Under the circumstances, this strategy was reasonable.
Even if defense counsel had denied that Atwater was guilty of any crime, there is no reasonable possibility that the jury would have reached a different conclusion given the evidence against him. See Patton v. State, 784 So.2d 380 (Fla.2000) (finding the facts counsel conceded were supported by overwhelming evidence and even if counsel had denied these facts, there was no reasonable possibility the jury would have rendered a different verdict). Therefore, the trial court properly denied Atwater's claim that defense counsel was ineffective for making certain concessions without Atwater's consent.
As to claim 2, Atwater presents several arguments in support of the assertion that in the penalty phase of the trial, defense counsel failed to adequately present evidence in mitigation and failed to adequately challenge the State's case. Claim 2 is without merit as well. The trial court dismissed this claim without an evidentiary hearing. As we stated above, a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The record in this case conclusively shows that Atwater is entitled to no relief. Therefore, the trial court properly dismissed this claim.
Although Atwater's claim 2 is without merit, Atwater's contention that certain evidence should have been but was not presented for consideration warrants discussion. Atwater claims that the following evidence was not presented: Atwater, born in 1963, never met or saw his father; Atwater was illegitimate and grew up in a town where this was frowned on. He and his mother were on public assistance and moved from one small town to another. Atwater's mother had an illegitimate daughter in 1965. The children were inadequately clothed and emotionally deprived. When Atwater's mother had bad luck with men, she drank gin. At age 3, Atwater suffered nosebleeds for a year before he *233 received medical attention; he was diagnosed with Von Willebrand Syndrome and an upper respiratory infection. Atwater was in a special reading class in elementary school; he later was diagnosed with ADD. In 1968, Atwater's mother became pregnant again and married the baby's father; Atwater's new stepfather physically and emotionally abused him. In 1974, Atwater's younger sister was hit by a car and died, and his mother was glad there was one fewer mouth to feed. Atwater had an interest in athletics in high school but could not afford to pursue these interests, and had to work. In high school Atwater became attached to a pastor in his church and his mother did not approve of the relationship; the pastor was transferred out of state. Atwater was intoxicated at the time of the murder.
Atwater argues that these facts show the following nonstatutory mitigators: poverty; lack of a father and, later on, a bad father figure; illegitimacy and community opprobrium; a nomadic family lifestyle; emotional deprivation as a child; alcohol abuse by his mother; physical and emotional abuse; learning disorders and retention in school; grief over the death of his sister; drug and alcohol addiction; early potential demonstrated by his participation in school athletics, economic support for his family, church activities, voluntary association with a beneficial male role model, and voluntary counseling, which were curtailed by his mother and poverty.
Atwater's personal and family history were, in fact, presented. Defense counsel offered the testimony of four lay witnesses and one expert witness in the penalty phase trial. Three of the four lay witnesses testified to events that occurred on the day of Smith's murder and one lay witness testified to recent interactions he had with Atwater and observations about Atwater and his family. Dr. Merin, a forensic psychologist and Atwater's expert witness, testified that he examined Atwater. In preparation for the penalty phase trial, Dr. Merin testified that he reviewed depositions, police reports, investigative reports, the autopsy report, and photographs. He conducted a battery of psychological tests on Atwater. He met with Atwater and discussed the events on the day of Smith's murder, as well as Atwater's personal and family history and background. He reviewed correspondence from Atwater's mother which supported Atwater's characterization of her. Dr. Merin recounted Atwater's personal history in his report and at trial, including the following facts: He was born in Connecticut and lived with his mother. She did not marry Atwater's father. Atwater never knew his father. When he was a small child, Atwater's mother had a daughter, who was also illegitimate. She later had a short marriage, and bore a son. Atwater's mother was frequently on welfare. When Atwater was ten and his sister was eight, his sister was killed in a car accident and Atwater's mother apparently blamed him. Atwater described his mother as an alcoholic who was selfish and egocentric, and her boyfriends were reportedly rich and married. His mother physically and emotionally abused him. Atwater quit school twice, the first time due to a knee injury which prevented him from playing football and thus gave him no reason to continue to attend school. The second time, Atwater quit after moving to another school district and attending for five or six months. He quit when his mother ordered him out of the house and he had to live at the Salvation Army. Atwater married when he was 23 or 24 years old, and the marriage lasted about four months. He slapped his wife because she did not clean the house. He has no children. He suffers from migraine headaches and uses Fiorinol and Codeine for relief. He had attended sessions with *234 a mental health professional in his early teens, but quit. He takes alcoholic beverages and has a history of smoking marijuana and using cocaine, LSD, hallucinogenic mushrooms, and amphetamine. He denies that he is dependent.
Dr. Merin's trial testimony reveals virtually the same factual evidence Atwater claims was not presented as fact, but as told to the doctor, which forms the basis for Atwater's claim that trial counsel was ineffective. The record refutes any prejudice to Atwater. The facts Atwater wishes to present as nonstatutory mitigating factors were presented and the sentencing court weighed these facts. In the sentencing order, the court stated:
In considering any other aspect of Defendant's character or record and any other circumstances in the evidence which was proffered as a mitigating circumstance, the Court has carefully considered the following: whether the Defendant was under the influence of mental or emotional distress (even if not "extreme"); whether the Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired (even if not "substantially" impaired) by lack of intelligence, personality disorder, consumption of alcohol or perception that his aunt was being treated abusively by the victim. The Court additionally considered and weighed the Defendant's family background and his lack of a close family relationship. All of these factors were presented to the jury during the penalty phase of the proceedings in this case, as well as now being fully considered and weighed by the Court.
In order to establish prejudice as required by Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. Atwater has not established any prejudice caused by defense counsel's failure to present the requested mitigating evidence as fact, as opposed to the presentation of that evidence through Dr. Merin. The record shows that the evidence as it was presented was considered in mitigation, and that the trial court did not find that this nonstatutory mitigation evidence outweighed the aggravating factors. There is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner.
Atwater argues that defense counsel should have objected to the prosecutor's use of the background mitigation evidence that was presented as nonstatutory aggravators; we find no error. Again the record clearly shows that the mitigation evidence offered was considered by the sentencing court. Atwater also argues that because defense counsel attempted to get a continuance for the penalty phase portion of the trial, he was not prepared to proceed when the penalty phase was begun. This argument, too, is refuted by the fact that virtually all the evidence Atwater would have put on in mitigation was actually put on and considered. For the same reason, we find no merit to Atwater's assertion that the trial court committed reversible error in its sentence of death which Atwater argues occurred because his expert, Dr. Merin, was not aware that he had been found guilty of a capital offense at the time of his deposition, which was taken after the guilt phase but before the penalty phase, and had not interviewed family members at that time. Again, the *235 mitigation evidence Atwater would have put on was actually considered.
Based on the foregoing, we affirm the trial court's denial of 3.850 relief and deny habeas corpus relief.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, and QUINCE, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which ANSTEAD, J., concurs.
LEWIS, J., concurs in result only.
PARIENTE, J., concurring in part and dissenting in part.
Although I concur with the majority's determination of the guilt phase issues, I dissent from the majority's affirmance of the trial court's summary denial of relief on Atwater's penalty phase ineffective assistance of counsel claim. Because I believe that the trial court erred in denying Atwater relief on that claim without an evidentiary hearing, I would reverse for a hearing on this issue.
In his postconviction motion, Atwater alleged that counsel was ineffective for, among other things, failing to adequately investigate and present mitigation in the penalty phase. As a result of this failure, Atwater alleged that counsel was unable to present a complete picture of Atwater to the jury, and that a complete picture would have provided the jury a reason to recommend a life sentence. In his 3.850 motion Atwater alleged:
3. Jeffrey Lee Atwater was born on December 24, 1963, in a hospital in Southington, Connecticut. Due to circumstances beyond his control Mr. Atwater's father had never met or seen Jeffrey Atwater.
4. Jeffrey and his mother lived in Plainville, Connecticut, a small factory town that frowned on illegitimate children and teenage mothers. They received public welfare assistance and moved from one small town to another in the Plainville area. On December 11, 1965, Jeffrey's sister, Croceann Atwater, was born. Her father Ronald Nolan never married her mother and was a small part of their lives.
5. Atwater's mother, now had two children to raise and support on her own. She was unskilled and unable to provide for them. They were inadequately clothed and emotionally deprived.
6. Ms. Atwater began working as a cleaning woman at a fuel company that was located next to her home. Mr. Atwater's mother dated various men, and when they did not show up for a prearranged dates she would drink gin to drown her sorrows.
7. At age three, Jeffrey was taken to a hospital because of constant nose bleeds that would not coagulate. This condition had continued for a year before he received medical attention. When he appeared before a physician he had black and blue marks on his chin and other parts of his body. He was diagnosed with Von Willebrand Syndrome and an Upper Respiratory Infection.
8. When Jeffrey entered elementary school he was placed in "special reading" classes. He had difficulty grasping concepts and required tutorial help. What is now known is that Jeffrey has ADD, Attention Deficit Disorder with a particular language based learning disability. This kind of disability causes one to misunderstood [sic] the information he receives. People with ADD and in particular with a learning disability such as this often tune out the world and react to it from the "disinformation." Little *236 wonder that Jeffrey lacked self-confidence and was unable to focus or concentrate on the subject matter being presented in class.
9. In 1968, Atwater's mother became pregnant with her third child. This time she married the child's father. Jeffrey's stepfather began to physically and emotionally abuse him.
10. In 1974, Jeffrey's younger sister was hit by a car while crossing the street near their home. She was hospitalized with a fractured skull and placed on a respirator. Two days later her mother had the respirator removed and she died. Jeff was distraught over his young sister's death. When he went to his mother for comfort she responded to him by saying "Now there's one less mouth to feed."
11. When Jeff entered high school he developed an interest in athletics and joined the football team and participated in cross country running. He was forced to leave his athletic endeavors because of his economic situation. He found a job and gave his mother fifty dollars a week to contribute to the family's expenses.
12. Still looking for emotional support and comfort Jeff attended a local church and began to participate in its youth services program. His mother did not approve of the Pastor at the church and the relationship he and Jeff developed. He often had Jeff join him and his family for dinner. The Pastor described Jeff as one of the "walking wounded." Jeff had been abused and abandoned and screamed out for attention. He responded to simple human kindness as an extraordinary act and would develop strong loyalties to who ever was kind to him.
13. When the Pastor was transferred out of state to another church Jeff was again left on his own without a support system. His relationship with his mother had deteriorated and he was forced out of her home and into the local Salvation Army facility. He was eighteen years old at the time. He continued to attend high school hoping to be able to graduate. He began to drink and use drugs which only exaggerated his emotional problems. He sought counseling to cope and overcome his addictions but his financial problems interfered with any consistent care.
In addition to this family and background information that Atwater presented in his motion, Atwater likewise pointed out that four of the five witnesses presented by counsel were State witnesses, and that only Dr. Merin was not a State witness.[7] In other words, no family members testified. On appeal, Atwater further argues that an evidentiary hearing is also required to determine: (1) why defense counsel presented Dr. Merin's recitation of Atwater's family history as if it were only Dr. Merin's version, rather than as if it were the truth; and (2) defense counsel's preparation for the penalty phase and counsel's desire for a continuance.
In denying the request for an evidentiary hearing, the trial court stated:
The Court has reviewed the record and agrees with the State's contention that defense mitigation witness Dr. Merin, a psychologist, testified to essentially the same information about defendant's early life and family situation as outlined in defendant's claim. Defense counsel also presented testimony from Dr. Merin and from three witnesses regarding defendant's alcohol use. The State points out *237 that the defendant does not suggest what other witnesses should have been called by the defense counsel to testify to mitigation. The Court adopts the State's response as to this claim, and finds that defendant does not meet the performance component of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, this ground has no merit.
As Atwater contends, it is not clear as to whether the trial court relied upon collateral counsel's failure to list the names of witnesses who would be available to testify as to background mitigation, but to the extent that the court did so, that reliance was improper. See Gaskin v. State, 737 So.2d 509, 514 n. 10 (Fla.1999). As we stated in Gaskin:
[N]othing in the rule states that a movant must allege the identities of the witnesses, the nature of their testimony, or their availability to testify. It is during the evidentiary hearing that Gaskin must come forward with witnesses to substantiate the allegations raised in the postconviction motion. Therefore, we hold that it was error for the trial court to require Gaskin to plead the identities of witnesses in order to be entitled to a hearing.
Id.[8]
Moreover, as the majority opinion explains, a defendant is entitled to an evidentiary hearing unless: (1) the motion, files, and records in the case conclusively show that the defendant is entitled to no relief; or (2) the motion on a particular claim is legally insufficient. See majority op. at 229. In cases in which there has been no evidentiary hearing on a claim, this Court must accept the defendant's factual allegations to the extent that they are not refuted by the record. See id. at 229.
In this case, the majority determines that the evidence Atwater sought to present at the evidentiary hearing was merely cumulative and that "[t]he record ... conclusively shows that Atwater is entitled to no relief." Id. at 232. The majority then goes on to evaluate the evidence. See id. at 233-35. Such an evaluation of the evidence, however, is a function much better performed by the trial court after an evidentiary hearing.
Further, Atwater's claim in this case is that his counsel's investigation of his family and background was inadequate and the only real evidence of family and background came in through the testimony of the expert, Dr. Merin, who specifically did not testify as to truth or accuracy. In fact, Dr. Merin told the jury that "[t]he presented history is essentially that, that is what he is telling me. What he is telling me may or not be factual." (Emphasis added.) Additionally, Atwater claims that defense counsel did not argue the existence of any mitigating biographical facts at all, other than to belittle them as details. He thus asserts that his counsel's "presentation" of background mitigation consisted only of an "excuse" for not presenting it because in closing, the only argument made by defense counsel with regard to background mitigation was as follows:
Lastly, given the history that this man gave to Dr. Merin, a history thatand evaluation that Dr. Merin thought was significant enough for you all to contemplate and give what weight you thought was appropriate, given all of his background of no father, I won't repeat it, I'm sure you can remember the details, this man was a product of that. Given *238 all that, is it no wonder that no one was here in the penalty phase to speak up for him?
Without an evidentiary hearing, it is impossible to state that the evidence Atwater sought to present was merely cumulative, where the information that the jury heard at trial came through an expert witness who did not vouch for the accuracy of the information instead of through family members or others close to Atwater who could testify first-hand to Atwater's difficult family upbringing. Without an evidentiary hearing, we do not know the potential qualitative effect of this evidence on the evaluation of the aggravation and mitigation both for the jury and the trial judge. It may be that defense counsel made a strategic decision not to present family members or other witnesses and to instead rely solely on the testimony of Dr. Merin. Without an evidentiary hearing, however, we are unable to make this determination.
Finally, even the majority's discussion of the facts presented at the penalty phase, see majority op. at 233-34, does not completely incorporate all of the mitigating factors that Atwater contends that counsel was ineffective for not presenting. See id. at 232-33. These factors that were not included in the penalty phase testimony include community opprobrium with regard to Atwater's illegitimacy, the nomadic family lifestyle, emotional deprivation as a child, learning disorders and retention in school, grief over the death of his sister, drug and alcohol addiction, early potential, physical and emotional abuse by his stepfather, and attachment to a pastor who was transferred out of state.
Given these allegations, the factual issues that Atwater raises should have been resolved in an evidentiary hearing. Indeed, this Court "[has] consistently held that a claim of ineffective assistance of counsel usually requires resolution by an evidentiary hearing where the defendant alleges sufficient disputed issues of fact." LeCroy v. Dugger, 727 So.2d 236, 242 (Fla. 1998) (Anstead, J., concurring in part and dissenting in part); see Rivera v. State, 717 So.2d 477, 485 (Fla.1998) ("[W]e agree with Rivera that he warrants an evidentiary hearing on his claim of penalty phase ineffective assistance of counsel."); Ragsdale v. State, 720 So.2d 203, 208 (Fla.1998) ("We conclude that Ragsdale has stated sufficient allegations of mitigation that are not conclusively refuted by the record to warrant an evidentiary hearing to determine whether counsel was ineffective in failing to properly investigate and present this evidence in mitigation."); Cherry v. State, 659 So.2d 1069, 1074 (Fla.1995) ("[W]e agree that Cherry is entitled to an evidentiary hearing on his claims that counsel was ineffective at the penalty phase.").
Because I believe that Atwater has sufficiently pled the claim of ineffective assistance of counsel during the penalty phase proceedings, and because this issue is not conclusively refuted by the record, I conclude that an evidentiary hearing on this matter was required, and therefore, I would remand on this issue.
ANSTEAD, J., concurs.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993)
[2] The issues that were the subject of the evidentiary hearing were (1) whether trial counsel improperly conceded Atwater's guilt to second-degree murder during the penalty phase closing argument and whether trial counsel prevented Atwater from testifying in his own behalf; and (2) whether trial counsel was ineffective during the guilt phase proceeding because of trial counsel's concession of guilt to a lesser crime and issues related to that allegation.
[3] Atwater testified that given the opportunity at trial, he would have testified that he was innocent and had not killed the victim. The trial court ruled that it was too speculative to find that such testimony would have altered the outcome of the case in light of the overwhelming evidence against Atwater. The trial court also held that defense counsel's plea to the jury to consider second-degree murder as an attempt to save Atwater's life, under the circumstances of this case, was legitimate trial strategy with or without Atwater's knowledge or consent, citing McNeal v. Wainwright, 722 F.2d 674 (11th Cir.1984), and McNeal v. State, 409 So.2d 528 (Fla. 5th DCA 1982).
[4] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)
[5] The following claims are procedurally barred because they could and should have been raised on direct appeal: 3, 5, 6, 9, 10, 12, 14, 15, 17 (which is a repleading of claims 3 and 9), and 19. See Harvey v. Dugger, 656 So.2d 1253 (Fla.1995); Rivera v. Dugger, 629 So.2d 105 (Fla.1993); Mendyk v. State, 592 So.2d 1076 (Fla.1992). The following claims are without merit: 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 20, 21 (this claim is a repleading of claim 1 which is more fully discussed in this opinion), and 22. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Provenzano v. Moore, 744 So.2d 413 (Fla.1999); Blanco v. State, 706 So.2d 7 (Fla.1997); Kennedy v. State, 547 So.2d 912, 913 (Fla.1989)("A defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing."). Claim 18 alleges cumulative error. Because we determine no errors occurred, we necessarily must conclude that this claim is without merit. See Downs v. State, 740 So.2d 506, 509 (Fla.1999) (finding that where allegations of individual error are found without merit, a cumulative error argument based thereon must also fail).
[6] Under Strickland, a defendant must demonstrate (1) deficient performance by counsel and (2) prejudice.
[7] At the Huff hearing, collateral counsel also stated that "Mr. Atwater's contention is that he wasn't even told that he could bring mitigation witnesses at the penalty phase."
[8] As Atwater advises, the trial court did not have the benefit of Gaskin when it issued its order.